UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

v.                                              No. 25-mj-7268-JCB

ALEJANDRO DAVID REYES AGUILAR,

Defendant.

ORDER

August 20, 2025

Boal, M.J.

In its discretion, this Court has determined that an evidentiary hearing would be useful to resolving two issues in this case: 1) the return, whereabouts of, or what happened to the property of the defendant Alejandro David Reyes Aguilar ("Reyes"); and 2) the government's noncompliance with this Court's June 17, 2025, order. To that end, this Court scheduled a hearing for July 10 and then August 14, 2025. The government asked this Court to reconsider and/or cancel each hearing in turn and has indicated its intent to appeal this Court's determination to hold an evidentiary hearing.

On August 7, 2025, one week before the second scheduled evidentiary hearing on August 14, 2025, the government moved to cancel that hearing. Docket No. 36. This Court denied that motion in an e-order dated August 11, 2025. Docket No. 38. The government then filed, on August 11, 2025, a motion captioned as one "for stay of execution of court orders." Docket No. 40. After a conference on August 12, 2025, I cancelled the August 14, 2025, hearing due to the assigned AUSA's unavailability, and, because the government had expressed an intention to

1

object to the exercise of my discretion to hold an evidentiary hearing, I indicated that I would supplement my August 11, 2025, e-order so that any review of my decision would be on a more complete record.  This memorandum is that supplement.

I.      FACTUAL AND PROCEDURAL BACKGROUND

On the morning of June 4, 2025, federal law enforcement agents arrested Reyes, a lawful permanent resident of the United States, while on his way to work.  According to the affidavit of Federal Bureau of Investigation ("FBI") Special Agent ("SA") Casey Biagiotti, Reyes' arrest was part of a concerted effort by special agents from Homeland Security Investigations ("HSI"), the Drug Enforcement Administration ("DEA"), and the FBI, who were "working collaboratively as part of a multi-agency effort supporting Immigration and Customs Enforcement ("ICE") efforts."  Docket No. 2 at 2.  Reyes was a passenger in a van driven by "Person 1," the intended target of a civil immigration enforcement arrest.  See id. at 2-3.  Later that day, Reyes was charged in a criminal complaint with assaulting, resisting, opposing, impeding, intimidating, or interfering with persons designated in 18 U.S.C. § 1114 while engaged in or on account of the performance of official duties in violation of 18 U.S.C. § 111(a)(1).

This Court held an initial appearance on June 4, 2025, at 4:00 p.m., at which time the government moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(A) (serious risk of flight).  At the initial appearance, SA Biagiotti and another agent were present in the courtroom.  Docket No. 14 at 2.  SA Biagiotti and her colleague returned Reyes' driver's license and U.S. Permanent Resident card to defense counsel.  Id.  Reyes believes that, shortly after his arrest, those two cards were removed from his wallet, which was in his pants pocket along with his keychain.  Id.  He also believes this occurred when, for reasons unknown, agents transported Reyes to a

2

cemetery in Lynn, Massachusetts for an unspecified amount of time, prior to transporting him to the ICE Field Office in Burlington, Massachusetts and then to the U.S. Courthouse in Boston, Massachusetts. Id.

This Court scheduled a detention and preliminary hearing for the next day, June 5, 2025, at 2:45 p.m. Prior to the start of the hearing, the government moved to dismiss the charges against Reyes. Docket No. 8. This Court granted the motion and dismissed the case.

On June 17, 2025, Reyes filed a motion for the return of the following property: his wallet and all cards and personal items contained therein and a keychain with his vehicle key. Docket No. 11. This Court granted the motion and ordered that "[t]he law enforcement agent(s)/agency in possession of the defendant's property must return it to the Federal Defender Office in Boston by 5:00 p.m. on Friday, June 20, 2025." Docket No. 12. The government did not object, move for reconsideration, appeal the Court's order, or move to extend the deadline for compliance. Unbeknownst to the Court, the property, however, was not returned to Reyes in violation of this Court's order.

The government has offered various explanations for its conduct at this point. On July 2, 2025, it stated that it "did not oppose that motion because it did not oppose the return of any personal property of Reyes that might have been in the government's custody." Docket No. 17 at 1. On August 7, 2025, it stated that it "did not seek an extension of the deadline for the return of property while the [AUSA] continued to work with counsel to clarify descriptions of the property and with the relevant agencies to locate it." Docket No. 36 at 2. In any event, no property was returned in violation of the court order and no explanation was provided to the Court prior to the June 20, 2025, deadline.

Reyes then moved for a show cause hearing, which this Court granted on June 25, 2025. Docket Nos. 14, 15. I scheduled an evidentiary hearing for July 10, 2025, at which time I intended to determine, among other things, "who was present during the arrest (or otherwise interacted with Reyes between the time of his arrest and his arrival at the courthouse), what property was seized, taken, or removed from Reyes, the chain of custody of that property, who currently possesses the property (including which agency), where the property is located, why it has not been returned as ordered by this Court, and whether any sanctions should be imposed." Docket No. 15 at 2-3. I directed SA Biagiotti, any other agents present during the arrest, and any other person involved in the chain of custody, to attend the hearing in person. I further directed that, by July 2, 2025, the government file a response and produce all reports and documents about the arrest and interactions with Reyes, about the seizure or taking of property from Reyes and its subsequent possession by the government, and all regulations and procedures regarding the inventory and handling of personal property seized or taken during an arrest for the agencies involved. Because I was considering whether sanctions should be imposed, I also directed that a copy of the order be emailed to the Chief of the Major Crimes Unit and the Chief of the Criminal Division at the United States Attorney's Office for the District of Massachusetts. Id. at 3.

On July 2, 2025, the government provided its response, including a representation that the property was lost. It further stated that "[t]he government is confident that the loss of the property was the result of oversight but not intentional. As such, . . . no further sanction beyond restitution for the lost items is necessary or warranted." Docket No. 17 at 3. The government also submitted declarations from the agents present and described the policies in place at FBI and ICE for remuneration. Because the government then asserted that "the questions relevant to the Court's inquiry . . . have been addressed in this response and the attached declarations," it

4

requested that Court reconsider its requirement that the government produce the pertinent agencies' regulations for handling personal property seized during an arrest,[1] reports about the incident, and its decision to conduct a hearing.  Id.

On July 3, 2025, I denied the partial motion for reconsideration because the declarations did not answer all of my questions and in fact raised additional questions.  Docket No. 18.  For example, FBI Special Agent Brian Gutierrez conducted a search of Reyes at the cemetery and retrieved a wallet from his right front pocket.  He then handed the wallet to the agent behind him, but does not recall who that person was.  Yet, none of the other agents have acknowledged receiving the wallet. Nevertheless, someone retrieved Reyes' license and green card from that wallet and presented those documents to defense counsel at the initial appearance in this case.  In addition, while some agents wore and activated body cameras during the initial place of arrest, those cameras were turned off at the cemetery.  I directed that the reports, procedures, and a declaration from the ICE counsel be turned over by July 8, 2025, cancelled the evidentiary hearing given the government's failure to timely produce the reports, and scheduled a conference with the attorneys for July 10, 2025 to discuss how to proceed.  Id.

On July 8, 2025, in a letter addressed to the Court, the government provided the requested reports and the ICE procedures, which the government had previously reported did not exist. The government also requested, because the procedures had now been provided, that the Court reconsider its order that the ICE counsel submit a sworn declaration regarding the inaccurate representation to the Court.

---

[1] In its submission, the government made the extraordinary representation that "[c]ounsel for ICE reports that she is unaware of any such regulations [pertaining to the handling of personal property seized during an arrest]."  Docket No. 17 at 3.  That representation turned out to be inaccurate.  See Docket No. 34.

At the July 10, 2025, conference, the Court and counsel discussed how to proceed. The Court denied the government's request to forego a declaration from ICE counsel. I also made clear that any hearing would serve two purposes. For example, I stated the following:

> In the context of a Rule 41(g) motion, which is how I construe Ms. Olson's request, this Court must make an evidentiary finding when a defendant requests the property held by the government. . . . There is also the very significant issue that the government simply ignored the Court's first order. At the very minimum, the government should have requested an extension of the deadline for returning the property. It should have alerted the Court that it didn't have the property.

Docket No. 27 at 10-11. I also later stated that there were two issues before the court: "One is the return of the property, and two is the government's noncompliance with the Court order . . ." Id. at 23. I then asked defense counsel if they preferred to wait to have a hearing until after the proposed compensation process with the FBI ran its course. Id. at 21-24. After defense counsel requested that the hearing go forward, on July 10, 2025, I issued an order scheduling an evidentiary hearing for August 14, 2025. Docket No. 26. In response to the government's request, I provided more specifics about the testimony expected at the hearing.

On August 7, 2025, one week before hearing, the government moved to cancel the hearing because it represented that the FBI had made, and Reyes had accepted, an offer to compensate him for the value of his property. Docket No. 36 at 3. The government acknowledged that "the declarations do not resolve exactly how the property was lost." Id. Yet, the government also asserted that "[t]here is no reason to believe that any of these witnesses will provide different information when questioned under oath as they did by way of sworn declaration." Id. at 3. The government further asserted in conclusory fashion "[n]o other

sanctions are necessary here." Id. at 5.[2]  On August 9, 2025, Reyes opposed the motion to cancel the hearing citing to the unanswered questions about Reyes' personal property and also case law allowing for a hearing even where the government is unable to locate the property.  Docket No. 37.  On August 11, 2025, for those reasons, this Court denied the request to cancel the evidentiary hearing.  Docket No. 38.

On August 11, 2025, the government filed a motion to stay, among other things, this Court's order denying the government's motion to cancel the hearing.  Docket No. 40.  For the first time, the government stated that the assigned AUSA was unavailable because she needed to prepare for a trial beginning on August 18, 2025.[3]  Because it was unclear exactly what relief the government was seeking, this Court scheduled a conference for August 12, 2025.  At that conference, the government made clear that it was primarily seeking to adjourn the August 18, 2025, hearing.  The government also was considering filing objections to this Court's order denying the government's motion to have a hearing because it argued that there was no longer any basis to have a Rule 41(g) hearing.  As discussed at the hearing, I intended to have a hearing both pursuant to Rule 41(g) but also under this Court's inherent power to determine the circumstances under which the government violated this Court's June 17, 2025, order, and, whether or not, there should be sanctions for such violation.

---

[2] Of course, compensating Reyes for his property that the government asserts was lost by them is not a sanction but compensation rightfully owed to Reyes.

[3] While the government did not provide the case name, this Court was able to determine that the case is United States v. Ubeda, No. 23-cr-30016-BEM, in which Judge Murphy, on May 30, 2025, set the case for trial on August 18, 2025. The government did not make any mention of this conflict at any time from July 10, 2025, when I set the date for the hearing, until August 11, 2025, just three days before the scheduled hearing.  This Court regularly accommodates conflicts and in fact had done so here when defense counsel had a conflict with a proposed date for the hearing in late July.  For that reason, this Court adjourned the August 18, 2025, hearing on the basis of the AUSA's unavailability.  Docket No. 42.

As a result, I cancelled the August 18, 2025, hearing based on the AUSA's conflict.  I further ordered that if the government did not timely object to my order(s), I would schedule a new date for the evidentiary hearing.  Docket No. 42.

II.    ANALYSIS

This Court seeks to hold an evidentiary hearing for two reasons.  First, I seek to better understand the circumstances around the seizure (or not) of Reyes' personal property at the time of the arrest.  Even where the property is no longer available, the First and Third Circuits have made clear that such hearings are within a court's authority so that it may determine what happened to the property, to locate the property, or to provide an incentive for the government to be consistent with its regulatory obligations to appropriately preserve and account for seized property.  See United States v. Cardona-Sandoval, 518 F.3d 13, 17 (1st Cir. 2008); United States v. Chambers, 192 F.3d 374, 378 (3rd Cir. 1999).  This Court is unable to make any meaningful determinations as to what actually happened based on the documents and declarations because, as set forth above, they are rife with inconsistencies and omissions.

Second, there is no dispute that the government violated this Court's June 17, 2025, order.  To state the obvious, this Court has the inherent power to impose sanctions for failure to comply with its orders.  See United States v. Kouri-Perez, 187 F.3d 1, 7 (1st Cir. 1999) (district courts are imbued with an array of "inherent powers" in performing their case-management functions); see also In re Charbono, 790 F.3d 80, 86 (1st Cir. 2015).  It is for that reason, among others, that this Court issued an order to show cause, scheduled a hearing, and explicitly put the government on notice that it was considering sanctions.[4]  Docket No. 15.  This

---

[4] This Court acknowledges that Reyes is not seeking sanctions against the government.  But this Court retains the inherent authority to impose sanctions for violation of its own orders.

Court has a vested in interest in understanding why its order was not complied with and whether or not there should be any sanctions as a result. This reason is separate and apart from a Rule 41(g) hearing but necessarily covers much of the same subject matter, such as how the agents initially handled the property, when they first looked for it after Reyes' arrest, and the efforts that they made to do so.

For all these reasons, this Court intends to hold an evidentiary hearing, and believes it is justified in doing so.

/s/ Jennifer C. Boal
JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE